IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA

ROBERT CORAL,                          )
                                       )
        Petitioner,                    )
                                       )
v.                                     )      No. 2:05 cv 1112-f
                                       )
Donal Campbell, Commissioner,          )
    Alabama Department of              )
    Corrections,                       )
                                       )
        Respondent.                    )

---

HABEAS CORPUS PETITION
BY A PERSON IN STATE CUSTODY

---

LaJuana Davis (DAV088)
122 Commerce Street
Montgomery, AL 36104
334-269-1803

Prisoner's name:    Robert Coral
Prisoner's number:  Z-507
Place of confinement: Holman State Prison
                    Atmore, Alabama 36503

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA

| | |
|---|---|
| ROBERT CORAL,<br><br>    Petitioner,<br><br>v.<br><br>DONAL CAMPBELL,<br>  Commissioner, Alabama<br>  Department of Corrections,<br><br>    Respondent. | No. _____ |

HABEAS CORPUS PETITION
BY A PERSON IN STATE CUSTODY

Petitioner Robert Coral, now incarcerated at Holman State Prison in Atmore, Alabama, respectfully petitions this Honorable Court for relief pursuant to 28 U.S.C. §2254 from his state conviction and death sentence.

## I.    PROCEDURAL HISTORY

1.    Robert Coral was convicted and sentenced in the Circuit Court of Montgomery County, Alabama, Fifteenth Judicial Circuit, No. CC-88-741.

2.    Mr. Coral was convicted on September 23, 1989. (R. 1735, 1925.) He received a jury recommendation of life imprisonment without the possibility of parole (R. 1735) which the trial court overrode in favor of death.

3.    Mr. Coral was sentenced to death by the trial court on October 20, 1989. (R. 1736,

1

1945.)

4.    Mr. Coral was convicted of the burglary-murder of Nancy Burt, a capital offense under ALA. CODE § 13A-5-40 (a)(4) (1975).

5.    He pled not guilty to all charges in the indictment. He was tried by jury. He did not testify at trial.

6.    He appealed his conviction to the Alabama Court of Criminal Appeals. The Court of Criminal Appeals remanded the case for the trial court to enter specific written findings concerning the existence of any aggravating and mitigating circumstances. *Coral v. State*, 585 So. 2d 248 (Ala. Crim. App. 1991). On return to remand, the Court of Criminal Appeals again remanded for the trial court to correct its sentencing order and to set aside Coral's conviction for a lesser included offense of murder because it was encompassed in the capital-murder conviction. *Coral v. State*, 628 So. 2d 954 (Ala. Crim. App. 1992). On return to second remand, Mr. Coral's capital-murder conviction and sentence to death were affirmed. *Coral v. State*, 628 So. 2d 988 (Ala. Crim. App. 1992), *aff'd*, 628 So. 2d 1004 (Ala. 1993), *cert. denied*, 511 U.S. 1012 (1994).

7.    Mr. Coral filed his Rule 32 petition in the Montgomery County Circuit Court on September 1, 1995. On September 28, 2001, the circuit court denied relief in Mr. Coral's case. (PCR. 266.) No evidentiary hearing was held in state postconviction.

8.    Mr. Coral appealed to the Court of Criminal Appeals. (PCR. 310.) The Court of

Criminal Appeals affirmed the judgment on May 28, 2004 in *Coral v. State*, 900 So. 2d 1274 (Ala. Crim. App. 2004), *overruled by Ex parte Taylor*, 2005 WL 2403729 (Ala. Sept. 30, 2005) (determination on direct appeal that there was no plain error for a substantive claim did not necessarily foreclose determination of the existence of prejudice under *Strickland v. Washington* for a related claim of ineffective assistance of counsel raised in a postconviction proceeding). An application for rehearing to the Court of Criminal Appeals was overruled on August 13, 2004. Mr. Coral petitioned the Alabama Supreme Court for a writ of certiorari; certiorari was denied on November 19, 2004 in *Ex parte Coral*, No. 1031798 (Ala. Nov. 19, 2004).

## II.    PETITION

### A.    MR. CORAL'S STATEMENTS TO POLICE WERE ADMITTED IN VIOLATION OF THE CONSTITUTION.

9.    Before trial, Mr. Coral moved to suppress four statements attributed to him that the prosecution wished to introduce through the testimony of four witnesses: Officer D.T. Marshall, case agent Corporal Terry Jett (R. 1008), Sergeant Clore, and government informant Dock Warren. The trial court suppressed the proposed testimony of government informant Warren after it found that the police had enlisted Warren to become Mr. Coral's cellmate in order to obtain incriminating statements after Mr. Coral had invoked his right to counsel. (R. 442.) Although Sgt. Clore denied under oath that he had asked Mr. Warren to do so, (R. 411, 415-16) the court concluded otherwise and suppressed Mr. Warren's testimony. The trial court then declined to suppress the three other defendant statements

3

taken by police officers. These three statements were admitted in violation of Mr. Coral's rights under *Miranda v. Arizona*, 384 U.S. 436 (1966) and *Edwards v. Arizona*, 451 U.S. 477 (1981).

### 1.    The Marshall Statement

10.    The first statement was obtained by Montgomery County detective D.T. Marshall on October 7, 1987. Detective Marshall approached Mr. Coral in the hallway of a Cook County, Illinois court where Mr. Coral was awaiting a probable cause hearing. When the Cook County charges against Mr. Coral were dismissed, Det. Marshall followed him to a Chicago police station where he interrogated Mr. Coral. Mr. Coral was handcuffed and in custody during this interrogation. (R. 255, 295.) Det. Marshall testified that he read Mr. Coral his rights from a *Miranda* card (State Exhibit 2) and that Mr. Coral acknowledged that he understood. Det. Marshall testified that immediately after he advised Mr. Coral of his rights, he interrogated Mr. Coral for over an hour and that he taped this conversation. (R. 255; R. 1072.) This tape was later destroyed (R. 1076), however Det. Marshall testified he typed out a transcript of the interrogation. (R. 1073.)

10.    At the start of the October 7th interrogation, Mr. Coral refused to sign a *Miranda* waiver card. (R. 1102.) According to Det. Marshall, Mr. Coral invoked his right to counsel on the next morning, October 8, 1987, and Det. Marshall ceased further questioning. (R. 263.)

11.    Mr. Coral denied that Det. Marshall advised him of his *Miranda* rights prior

4

to the October 7th taped statement. (R. 294.) Mr. Coral's testimony is supported by the absence Mr. Coral's signature on the *Miranda* waiver card. Mr. Coral's testimony is further supported by the absence of any evidence from the taped interrogation indicating that Mr. Coral was being or had been advised of his *Miranda* rights, or, for that matter, gave his consent to the alleged taping of the interrogation. The tape transcript does reveal that Officer Marshall began his interrogation by telling Mr. Coral: "What you lie to me about or tell me the truth about--listen to me good--if you did do this it may make the difference between you going to the electric chair or going to prison." (R. 266.)

12.    Based on this record, the prosecution failed to meet its heavy burden to establish a knowing and intelligent waiver of Mr. Coral's rights. The only evidence the prosecution adduced was the testimony of Detective Marshall. Det. Marshall's testimony was not supported by any other law enforcement official and was contradicted by Mr. Coral's testimony. The only other record evidence--the unsigned *Miranda* waiver card and the transcription of the interrogation fail to support a claim of waiver. To the contrary, during the interrogation, Mr. Coral said that he did not want to talk anymore. (R.1092-93.) Finally, the coercive language used by Officer Marshall, in essence threatening Mr. Coral that whether he talked or not would make the difference between prison or the electric chair, further demonstrates that the alleged waiver was not knowing and voluntary.

2.    The Clore Statement

13.    On or about November 6, 1987, approximately a month after Mr. Coral

5

invoked his right to the presence of counsel during the Marshall interrogation, Sergeant Clore

of the Illinois police approached Mr. Coral while Mr. Coral was waiting for another probable

cause hearing. (R. 240.) Sgt. Clore was working with the Alabama police and he testified that

he knew about the earlier Marshall interrogation. (R. 240.) Sgt. Clore further admitted that

he knew that Mr. Coral had an attorney representing him at the probable cause hearing, but

chose not to inform counsel of his interest in conducting a further interrogation. (R. 242.)

According to Sgt. Clore, Mr. Coral was in custody, (R. 218), and was advised of his *Miranda*

rights but refused to sign the waiver of rights form. (R. 240.) Sgt. Clore testified that he

thought Mr. Coral did refused because "he preferred not to sign that form until he had the

chance to talk with an attorney" (R. 240.) Mr. Coral respectfully submits that the statement

allegedly given to Sgt. Clore should have been suppressed for violations of defendant's

constitutional rights under both *Miranda* and *Edwards*.

14.    Initially, the Clore statement was taken after Mr. Coral invoked his right to

have counsel present during the Marshall interrogation of October 8th, and Sgt. Clore knew

about this interrogation.  Wholly apart from Mr. Coral's prior invocation of the right to

counsel, the record establishes that Mr. Coral effectively invoked the right to counsel again

in this instance.

15.    In *Minnick v. Mississippi*, 498 U.S. 146 (1990), the United States Supreme

Court reversed a capital defendant's murder conviction because police officers' failed to

abide by the defendant's request for counsel prior to initiating further interrogation.  In

*Minnick*, the defendant, like Mr. Coral had refused to sign a *Miranda* waiver card, and had, as Det. Marshall admitted here, squarely invoked the right to have any attorney present before further interrogation. *Minnick*, 498 U.S. at 148. In *Minnick*, the Supreme Court rejected the State's contention that the defendant's subsequent consultation with counsel eliminated the Fifth Amendment's protection against further uncounseled interrogation. *Id.* at 156. The Court held that once a suspect invokes his right to counsel, the State cannot initiate a custodial interrogation. *Id.*, citing *Edwards v. Arizona*, 451 U.S. 477 (1981).

16.    In Mr. Coral's case the statements taken by Sgt. Clore (November 6, 1987) and Corporal Jett (November 11, 1987) were initiated by the police and came <u>after</u> Mr. Coral invoked his right to counsel with Det. Marshall.[1] Accordingly, the Clore and Jett statements should have been suppressed because of the State's violation of Mr. Coral's rights under *Miranda* and *Edwards*.

17.    In addition, Sgt. Clore's testimony reveals that Mr. Coral again invoked his right to counsel during the interrogation. Although Sgt. Clore recalls that Mr. Coral allegedly only refused to sign the waiver card without benefit of counsel, his interpretation of Mr. Coral's request as limited to advice on the wisdom of signing the waiver point is beside the point. Once Mr. Coral indicated he needed the assistance of counsel to understand his rights, the interrogation should have ended.

3.    The Jett Statement

---

1.  Sgt. Clore testified that he procured Mr. Coral's statement while Mr. Coral was in custody (R. 218.)

18.     Montgomery police officer Terry Jett also took a statement from Mr. Coral on November 10, 1987 after transporting Mr. Coral from Illinois to Alabama. Mr. Coral was alleged to have said, "If you think I did it, prove it." (R. 1043.) This statement should have been suppressed because it was taken after Mr. Coral invoked his right to counsel with Det. Marshall on October 7th or 8th, 1987 and after Mr. Coral invoked his right to counsel on November 6th with Sgt. Clore. (R. 1028-29.)

19.     The admission of the Jett statement was not harmless error. The prosecution made strenuous and repeated efforts to get this comment before the jury both during direct testimony and on rebuttal. *See* R. 1031, 1099.

B.     MR. CORAL'S CONVICTION SHOULD BE REVERSED BECAUSE OF *BRADY* VIOLATIONS.

20.     The prosecution violated its duty to disclose exculpatory evidence to the defense under *Brady v. Maryland*, 373 U.S. 83 (1963). At trial, the court ordered disclosure of all *Brady* information on August 18, 1988 and again on May 17, 1989. However, the prosecution suppressed, until the eve of trial in August 1989, a police statement of a child witness who told the police soon after the murder that he saw the decedent enter her apartment and that she was followed by a white man who entered the apartment with keys.

21.     This Brady violation was prejudicial for several reasons. The child's contemporaneous account tended to exculpate Mr. Coral, a biracial man, and inculpated the victim's live-in boyfriend, who is white. The defense argued at trial that the victim's boyfriend, Tracy Headley was a much more credible suspect, as he was violent, was the last

8

person to see the decedent before her death, had blood compatible with that of the decedent's on his clothes, and had a stormy relationship with her. The child witness's contemporaneous account that the white man got out of a small white car was also consistent with the car Mr. Headley drove.

22.    In addition to concealing this witness from the defense, the prosecution arranged for a psychological examination of the child witness without notice to the defense or to the court. Although Officer Terry Jett testified that he had telephone communications with the psychologist regarding the conclusions he reached after his paid consultation (R. 181), no written psychological reports were ever furnished to the State, and therefore of course, to the defense.

23.    When this information was disclosed for the first time just prior to trial, the trial court held that the prosecution had committed a *Brady* violation and ruled that it had no choice but to grant a short continuance of the trial date of approximately one month.  (R. 190.)  This remedy, however, was too little and too late.

24.    As a result of the government's violation, Mr. Coral's attorneys were unable to investigate a vital and contemporaneous lead. Second, Mr. Coral was unable to take steps to memorialize this small child's recollection of the events at issue either by means of a statement or tape. Additionally, police records indicate that a tape was made of the child's contemporaneous statement (*see* R. 184 "this meeting was arranged to go over any and all information previously recorded in the taped statement from John Snoudon and P.J. Snoudon

previously recorded."). However the police case agent denied the knowledge of such a tape. (R. 190.) Had the prosecution timely disclosed the tape, the defense could have verified its existence in 1987 rather than trying, two years later, to locate the tape and any law enforcement officers who may have been involved in taking P.J. Snoudon's statement. Similarly, had timely disclosure of the existence of this witness been made, defense counsel could have taken steps to insure that any state psychological examination be conducted under court supervision, and only for just cause. The *Brady* violation in this case was not cured by the continuance at trial.

C.    MR. CORAL'S CONVICTION SHOULD BE REVERSED FOR FAILURE TO AFFORD HIM A SPEEDY TRIAL IN VIOLATION OF HIS RIGHTS UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS.

25.    Mr. Coral was incarcerated for twenty-two months without bond prior to his trial. He was arrested in November 1987 and detained without bond until August 1989.[2] Defense counsel moved to dismiss Mr. Coral's indictment on speedy trial grounds. (R. 109.)

26.    Mr. Coral suffered prejudice from the denial of his speedy trial rights. Prejudice is measured by the three interests that the speedy trial guarantee is intended to prevent: (i) oppressive pretrial incarceration, (ii) anxiety by the accused, and (iii) impairment of the defense. *Barker v. Wingo*, 407 U.S. 514, 532 (1972). Regarding the first prong, Mr. Coral's twenty-two months of pretrial detention, all but one month of it without bond,

---

2. A $100,000 bond was set on August 7, 1989 after the trial court continued the case after finding that *Brady* material was not timely disclosed to the defense.

qualifies as oppressive pretrial incarceration. Second, the anxiety while awaiting a capital murder trial is present here. Finally, Mr. Coral's defense would have been supported by the child witness' first remembrances of who entered the victim's apartment. Two years later, however, the memory of the child witness was substantially different.

D.    MR. CORAL'S TWENTY-TWO MONTH PRETRIAL DETENTION WITHOUT BOND FOR MONTHS VIOLATED THE EIGHTH AND FOURTEENTH AMENDMENTS.

27.    Mr. Coral was arrested in November 1987 and was detained without bond until August 1989. He submits that incarceration without bond for this length of time is punitive and violates due process, requiring reversal.

28.    The constitutionality of pre-trial detention without bond was upheld by the United States Supreme Court in *United States v. Salerno*, 481 U.S. 739 (1987), when the Court held that the federal preventive detention statute, 18 U.S.C. § 3141, was not facially unconstitutional. More specifically, the court held that because the federal preventive detention statute permitted denial of bail only under narrowly limited circumstances, preventive detention did not violate due process by imposing a punishment upon a defendant not violate due process by imposing a punishment upon a defendant pre-trial. *Id.* at 747-51. Critical to the *Salerno* opinion's conclusion was its observation that the "maximum length of pre-trial detention is limited by the stringent limitations of the Speedy Trial Act. *Id.* at 747. Under the federal Speedy Trial Act, the federal government must bring the defendant to trial within seventy days from indictment. *See* 18 U.S.C. § 3161. *Salerno* reserved ruling

11

on "the point at which detention in a particular case might become excessively prolonged, and therefore, punitive." *Id*. at 747 n.4.

29.    In this case, Mr. Coral was detained without bond for approximately 650 days. Thus, if the federal speedy trial period of seventy days represents a constitutionally significant time limitation on preventive detention, as the *Salerno* opinion indicates, then defendant has been preventively detained for more than six times the acceptable constitutional period. Accordingly, the 650-day detention of defendant without bond in this case was punitive and violated the petitioner's due process rights under the Fifth Amendment of the United States Constitution.

E.    THE RACIALLY DISCRIMINATORY USE OF PEREMPTORY CHALLENGES VIOLATED MR. CORAL'S RIGHTS UNDER THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

30.    The State's use of five peremptory challenges against five veniremembers--four blacks and one Hispanic--during jury selection violated Mr. Coral's rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

31.    During jury selection at Mr. Coral's trial, the prosecution used five of its sixteen peremptory strikes to remove black venirepersons. Before the jury was sworn, Mr. Coral objected that these strikes violated *Batson*. (R. 589-90.) The trial court did not expressly rule that Mr. Coral had established a prima facie showing of discrimination but did require the prosecution to explain its peremptory strikes. (R. 597-98) By requiring that the

prosecution explain its peremptory strikes, the court implied that Mr. Coral made a prima facie showing of discrimination and shifted the burden to the prosecution to provide racially neutral reasons for those strikes.

32.    The prosecution offered as a reason for striking Ivan Gonzalez, an Hispanic prospective juror, that "he was not a person that was in our over all plan of what jury we're looking for." (R. 603.) While the prosecution did suggest that it had believed that Mr. Gonzalez was white, and not Hispanic, this assertion is no more than the affirmation of good faith held by *Batson* to be insufficient to rebut a prima facie showing of discrimination. *Batson*, 476 U.S. at 98.

33.    For striking Willetta Martin, the prosecution stated that since Ms. Martin's husband is a minister, "she had a connection with forgiving someone for a wrong, [and] it's the State's position that they should not be forgiven for a wrong but rather should be punished for it." (R. 600.) None of Ms. Martin's voir dire testimony supported this assertion. Further, an assumption that a minister's spouse will be more likely to forgive than to punish is implausible. In many death cases, the prosecution argues on religious grounds that the jury should recommend death. *Cf. Jackson v. State*, 557 So. 2d 855 (Ala. Crim. App. 1990) ("[i]n deciding a *Batson* issue, the importance of a thorough voir dire *and the significance of its absence* should not escape notice"). Likewise, the prosecution's explanation for striking Lawrence Lee was pretextual: Mr. Lee's possession of a pistol without a license is a "record linked to the specific allegations in this case with this defendant[.]" (R. 599.)

34.     A prosecutor may not rebut a prima facie showing of discrimination "merely

by denying any discriminatory motive or 'affirming his good faith in individual selections.'"

*Batson*, 476 U.S. at 98.  The discriminatory practice of excluding qualified jurors violated

*Batson v. Kentucky*, 476 U.S. 79 (1986), and the Sixth, Eighth, and Fourteenth Amendments

to the United States Constitution. The prosecution's bias in jury selection deprived Mr. Coral

of a trial by a fairly selected jury panel.

F.     THE GUILT PHASE AND PENALTY PHASE JURY
       INSTRUCTIONS ON REASONABLE DOUBT VIOLATED
       THE EIGHTH AND FOURTEENTH AMENDMENTS.

35.     In *Cage v. Louisiana*, the United States Supreme Court held that a criminal

defendant's right to due process guaranteed by the Fourteenth Amendment is violated where

a reasonable juror could have interpreted a reasonable doubt instruction to allow a finding

of guilt based on a degree of proof below that required by the Due Process Clause.  *Cage v.*

*Louisiana*, 498 U.S. 39 (1990), *overruled on other grounds by Estelle v. McGuire*, 502 U.S.

62 (adopting a "reasonable likelihood" standard of review for jury claims).  In particular, the

Court held that even where a jury is instructed that guilt must be found beyond a reasonable

doubt, where that instruction equates

>     a reasonable doubt with a 'grave uncertainty' and an 'actual
> substantial doubt,' and state[s] that what [is] required [is] a
> 'moral certainty' that the defendant was guilty. It is plain to us
> that the words 'substantial' and 'grave,' as they are commonly
> understood, suggest a higher degree of doubt than is required for
> acquittal under the reasonable doubt standard. When those
> statements are then considered with the reference 'moral
> certainty,' rather than evidentiary certainty, it becomes clear that

14

> a reasonable juror could have interpreted the instruction to allow
> a finding of guilt based on a degree of proof below that required
> by the Due Process Clause.

*Cage*, 498 U.S. at 41. Because Mr. Coral's jury received a remarkably similar instruction

regarding the meaning of reasonable doubt for its guilt and penalty phase deliberations, Mr.

Coral's conviction and sentence of death must be reversed.

      1.     The Guilt Phase Jury Instructions.

36.    In its guilt phase jury instructions, the trial court charged the jury that

'reasonable doubt' is properly equated with 'substantial doubt.' Moreover, the trial court

repeatedly charged the jury that the before returning a guilty verdict, the jurors must be

convinced of Mr. Coral's guilt beyond a reasonable doubt *and* to a moral certainty. In

particular, on two separate occasions the jury was charged is such a way that "a reasonable

juror could have interpreted the instruction to allow a finding of guilt based on a degree of

proof below that required by the Due Process Clause":

> It is for you to determine, based on the evidence in this case,
> what really happened. What is the truth of this matter. What
> have you been convinced of beyond ar reasonable doubt and to
> a moral certainty, as I will explain those terms in just a moment,
> and what have you not been convinced of.

R. 1463.

> The measuring stick is a reasonable doubt and to a moral
> certainty, so it's important that you understand that, and I've
> already gone over it with you several times. But once again, the
> doubt which would justify an acquittal must be an actual and
> substantial doubt. It's not some mere guess or surmise, it's not
> a forced or capricious doubt. If after considering all the evidence

15

in the case you have an abiding conviction or the truth of the charge, then you are convinced beyond a reasonable doubt and it would be your duty to convict the defendant. The reasonable doubt which entitled an accused to an acquittal is not some mere fanciful, vague, conjectural or speculative doubt, but a reasonably substantial doubt arising from the evidence and remaining after a careful consideration of the testimony and exhibits and reasonable inferences to be drawn therefrom such as any reasonable, fair minded and conscientious man or woman would entertain under all the circumstances. Now you will observe that the State is not required to convince you of the defendant's guilt beyond all doubt but simply beyond all reasonable doubt. If after comparing and considering all the evidence in this case your minds are left in such a condition that you cannot say that you have an abiding conviction to a moral certainty of the defendant's guilt, then you are not convinced beyond a reasonable doubt, and the defendant would be entitled to an acquittal at hands. A jury is said to be so satisfied when it or its members are so satisfied from the evidence that they would be willing to act upon that degree of conviction in matters of the highest importance to themselves personally.

(R. 1492-93.)

37.    Mr. Coral's jurors reasonably could have interpreted the trial court's instructions--which, as in *Cage*, equate 'reasonable doubt' with 'substantial doubt'--to allow a finding of guilt based on a degree of proof below that required by the Due Process Clause. As in *Cage*, these instructions equate 'reasonable doubt' with 'substantial doubt'. By charging that guilt must be found beyond a reasonable doubt *and* to a moral certainty, these instructions make it even plainer than in *Cage* that a finding of guilt would be allowed on a degree of proof below that required by the Due Process Clause. In addition, the trial court shifted the burden to the defense by charging the jury that it must "justify" an acquittal:

16

> But once again, the doubt which would justify an acquittal
> must be an actual doubt and substantial doubt.

(R. 1491.) While this instruction is subject to an interpretation which removes the ordinary meaning of 'justify', a reasonable juror certainly could have interpreted the instruction to mean that the defendant had to show that no reasonable doubt existed before an acquittal could be returned, thereby violating Mr. Coral's rights under the Sixth, Eighth and Fourteenth Amendments to the United States Constitution. For these reasons, Mr. Coral's conviction must be reversed.

### 2.    The Penalty Phase Jury Instructions.

38.    Thus, the penalty phase jury was charged that in its deliberations, it should employ the guilt phase instructions equating 'reasonable doubt' with 'substantial doubt.' The trial court began its instructions to the penalty phase jury:

> Ladies and gentlemen, it is my duty again to instruct you and
> charge you as to the law. In charging you I want to remind you
> of the instructions that I gave you yesterday concerning this
> matter in the guilt stage, concerning the basic law in defining the
> terms of reasonable doubt and moral certainty as well as your
> duties and functions as jurors.

(R. 1686-87.) Because a reasonable juror could have interpreted this instruction to allow a finding of guilt based on a degree of proof below that required by the Due Process Clause, Mr. Coral's sentence of death must be reversed.

### G.    THE PRESENCE OF A RELATIVE OF THE VICTIM AT THE PROSECUTION'S TABLE AT TRIAL DENIED MR. CORAL A FAIR TRIAL.

17

39.     Throughout Mr. Coral's trial, a member of the victim's family sat with the prosecution team. (R. 612.)  The constant presence of a family member of the victim at the prosecution's table violated Mr. Coral's Sixth and Eighth Amendment rights.

H.    THE TRIAL COURT'S PENALTY PHASE JURY INSTRUCTION REGARDING MITIGATING CIRCUMSTANCES VIOLATED MR. CORAL'S RIGHTS UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ALABAMA LAW.

40.     In *Mills v. Maryland*, 486 U.S. 367 (1988), the United States Supreme Court held unconstitutional instructions which a reasonable juror could interpret as requiring unanimous findings by the jury on the absence or presence of mitigating factors.  In the instant case, because a reasonable juror could have interpreted the penalty phase jury instructions to mean that a mitigating circumstance could be considered only if each the jurors believed it existed, Mr. Coral's sentence of death must be reversed. (*See* R. 1689, 1700-01.)

41.     By failing to charge Mr. Coral's penalty phase jury that it need not unanimously find that a particular mitigating circumstance exists before individual jurymembers could consider it, the trial court left room for a reasonable juror to conclude that a unanimous finding of the mitigating factor must occur before he or she could consider it in deliberating on the appropriate sentence for Mr. Coral.  This violated his rights under the Eighth and Fourteenth Amendments to the United States Constitution and his sentence of death must be reversed.

I.    PROSECUTORIAL MISCONDUCT VIOLATED MR. CORAL'S RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

42.    The prosecution's misconduct in the guilt and penalty phase closing arguments of Mr. Coral's trial mandates reversal. This misconduct included arguing that the State's version of events was the "truth", arguing that evidence existed which the State was not "allowed" to present but which demonstrated Mr. Coral's guilt, and arguing that the defense was attempting to dupe the jury. In addition, the State suggested that the defendant's decision not to testify should weigh in favor of a death sentence, violating Mr. Coral's Fifth, Sixth and Eighth Amendment rights.

1.    The Prosecution Improperly Argued To The Guilt Phase Jury That Its Version Of Events Was "The Truth."

43.    The prosecution argued repeatedly that its version of events was "the truth," violated the prohibitions against injecting personal opinion into the proceedings and against vouching for one's witnesses. This misconduct was aggravated by the prosecution's informing the jury that it had evidence--but was not "allowed" to present it--demonstrating Mr. Coral's guilt. (R. 1443) The prosecution committed misconduct in making the following guilt phase closing remarks:

> I mean we are here-- and there's some difference of opinion on this, but we are here to seek the truth. Now remember at one point Mr. Travis said how the State of Alabama is here to --I think, you know, to present evidence and seek the truth, and that is exactly why we are here --to seek the truth. As opposed to what Mr. Travis said a couple of times their role is was to show

a reasonable doubt or suggest a reasonable doubt. We are here to give you the evidence, what we can find, what we are allowed to give you, and then say there it is. You do what you're supposed to do.

(R. 1423.)

Mr. Travis made the statement nobody in this courtroom would want to do your job. I would love to do your job. If you could sit in there and hear all the evidence and say I'm gonna find the true verdict, I'm gonna sift through the bull -- if you'll excuse the expression -- and I'm gonna get to it. Like the woman said on the old Wendy's commercials" Where's the beef? Sift through all the stuff that they've thrown at you and go to everything that shows you that the defendant did it.

(R. 1430.)

And if they were so interested in you getting the truth and they knew the different versions of the story then why didn't they ask him if the person that committed the murder was in the courtroom? Why did I have to ask him, if they were so interested in you hearing all this like he would have you believe? They were interested in you hearing the story they wanted put in his mouth and him say yeah, yeah, yeah, yeah.

\* \* \*

You say him testify, you saw how proud he was that he told the truth, didn't you. He was so proud of himself and everyone else in the courtroom was, too. Well almost everyone else. He told the truth.

(R. 1433.)

And the defendant said it looks like thirty-eight. And that was what was in his statement and that's what he said but they would have you believe that he said it's got a long barrel, and it just wasn't in there and you heard it. And attempt at getting something out that just wasn't there. Turn your attention away from the truth. Well, the truth is he said it was a thirty-two and

20

> that's what he had. The truth is that he told Jerome Hamilton
> that he had the gun here and that he needed money to get back
> and that he knew a place where he could rob with this old
> woman, and that he would kill her if he had to. That's the truth.

(R. 1435.)

> You know, whatever people do you can put the truth in a basket
> and you can drop it down in the ocean and you can tie it up, but
> it's gonna come out. And the person with the key in this case -
> at first I thought it was Bill Braden. Well, Bill Braden does tell
> you that he said he did it, and that is obviously very important.
> And you saw him testify and you heard him, the way he
> testified. You knew he [was] telling the truth. You know, when
> he was describing the gun couldn't you see that gun? I could.

(R. 1442.)

> When you do what we are asking you to do then go back there
> and find the truth, you'll go back there and talk. *** [A]nd
> when you've got that truth in your mind you say I want to talk
> to you about this truth that I know, and this is how I know it.
> And then another person will say you're right. And you'll be
> talking about that truth and somebody else will say here's
> another truth we know, isn't it? And you'll keep talking about
> it and before long there'll be twelve of you that'll say you're
> absolutely right. He did it. He did it. We heard the evidence,
> we've got the evidence, we will do our duty now. We will find
> him guilty as charged of the capital murder of Nancy Burt.

(R. 1445.)    This misconduct was further aggravated by the prosecution's improper

suggestion that one of its key witnesses was particularly credible:

> Lonny [*sic.*] Harden. I love listening to Lonny Harden give his
> qualifications because that man is so qualified. He's taught in
> Great Britain, he's taught all over the world, he knows his stuff.
> And you heard what he said.

(R. 1428.)

21

44.    The prosecution's misconduct in arguing that its version of events was the truth

was further aggravated by the improper argument that a purported eyewitness was telling the

truth:

> But the key in this case as you know is P.J. Because they say we
> don't have anybody that can put him at her apartment. Well,
> yes, we did. Yes, we did. Because he came in and sat on that
> stand and you heard him testify, and that little boy is not gonna
> lie to you. It was obvious that he was telling the truth and trying
> so hard.

(R. 1443.) Here the prosecution made use of testimony by a critical witness which it knew

or should have known was false. The State argued during its guilt-phase closing that witness

P.J. Snowden told the truth on the stand when it had statements directly contradicting the

child's trial testimony. (R. 1445.)

45.    In addition to vouching for the truth of its versions of events and for some

particular witness' veracity, the prosecution committed reversible error during his sentencing

phase closing argument by commenting on Mr. Coral's exercising his right not to testify.

The prosecution made the following prejudicial remarks:

> You know on September 18th and since then he has made many
> people cry. I have not heard, as was suggested by Mr. Travis in
> his opening statement, the reason for this crime. You're gonna
> get to know this man and maybe understand why it was
> committed. I don't understand it.

46.    These errors by the prosecution individually and collectively denied petitioner

due process of law and a fair trial and sentencing determination. A prosecutor must avoid

any improper methods that might result in an unreliable or unjust verdict. *Berger v. United*

22

*States*, 295 U.S. 78, 88 (1935) ("while [the prosecutor] may strike hard blows, he is not at liberty to strike foul ones."). Had these errors not been committed, Mr. Coral would have not received a capital murder conviction and the death penalty.

J.    THE IMPOSITION OF A DEATH SENTENCE BY THE TRIAL COURT AFTER THE JURY RETURNED AN 8 TO 4 VERDICT FOR LIFE IMPRISONMENT VIOLATED APPELLANT'S RIGHTS UNDER THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS.

47.    The jury that considered all the evidence in this case determined that life imprisonment without parole was the appropriate punishment for the crime for which Mr. Coral was convicted. The trial court's summary dismissal of that determination and subsequent imposition of a death sentence deprived appellant of basic constitutional guarantees.

48.    Judge H. Randall Thomas sentenced Mr. Coral to death pursuant to ALA. CODE § 13A-5-47, which provides that a trial court is not bound by a jury's sentencing recommendation. However, the United States Supreme Court has held in *Ring v. Arizona*, that "[c]apital defendants . . . are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment." 536 U.S. 584, 589 (2002). The trial court's rejection of the jury verdict for life violated Mr. Coral's Sixth, Eighth and Fourteenth Amendment rights.

49.    The judicial override in Mr. Coral's case was also improper as a violation of the Equal Protection Clause because (a) similarly-situated capital defendants have not been

23

sentenced to death pursuant to a judicial override because there is no standard to guide the trial courts regarding whether to impose death after a life verdict; and (b) the death penalty is imposed in Alabama disproportionately on those who are accused of killing white persons.

50.    Alabama has adopted no mechanism to ensure that defendants given jury life-without-parole verdicts are treated alike.  There is a complete lack of uniformity and consistency in the way trial courts consider jury verdicts of life.

51.    The Alabama appellate courts have developed no mechanism for determining when an override is appropriate in any particular case.  In affirming Mr. Coral's sentence of death, the Alabama appellate courts did not consider the judicial override itself against any objective measure of propriety and did not determine whether similarly situated persons were being treated alike.

K.    THE TRIAL COURT'S CONSIDERATION OF A PREJUDICIAL PRESENTENCE REPORT VIOLATED MR. CORAL'S RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS.

52.    Prior to sentencing Robert Coral to death, the trial court considered a presentence investigation report prepared by the Alabama Board of Pardons and Paroles.  (R. 1926.)  This report was inadmissible and highly prejudicial to Mr. Coral.

53.    It contained unsubstantiated hearsay comments about petitioner's reputation which were not used to rebut any evidence adduced at trial.  The report included an attachment with discussed the emotional impact of the crime on the victims' family.

54.    Also included in the presentence report were a list of arrests that occurred

24

while petitioner was a juvenile. It was reversible error for these arrests to have been considered at the sentencing hearing under Alabama law, particularly in light of the court's rejection of the jury's life verdict. These convictions should not have been used to rebut the mitigating factor of no significant criminal history.

56. The inaccurate and inadmissible statements contained in this presentence report were prejudicial to petitioner and deprived him of a reliable sentencing determination. *Gardner v. Florida*, 430 U.S. 349 (1977). Had the report not contained improper evidence, Mr. Coral would likely not have been sentenced to death. His rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution were violated by the prejudicial presentence report.

### L.    MR. CORAL'S JURY POOL UNDERREPRESENTED AFRICAN-AMERICANS.

56. Mr. Coral was entitled under state and federal law to consideration by a grand and traverse jury chosen from a pool that represented a fair cross section of the community. ALA. CODE §12-16-55 (1975); *Taylor v. Louisiana*, 419 U.S. 552 (1975); *Thiel v. Southern Pacific Co.*, 328 U.S. 217 (1946). However, his jury pools were selected in a manner which did not comport with constitutional guarantees and did not reflect a fair cross section of the community.

57. The traverse jury venire from which Mr. Coral selected his jury was composed of 52 persons of color. The race of one venireperson, Johnnie Knox, was unknown. Even assuming that Mr. Knox was a person of color, the traverse jury pool was 24.3% persons of

25

color. In 1988, the population of Montgomery County was 44% persons of color. 1988 Alabama Vital Events, Alabama Department of Public Health: Est. population of Montgomery County. The disparity between the percentage of persons of color in the jury venire and the percentage of persons of color in Montgomery County is statistically significant in showing that the method of selecting venirepersons leads to underrepresentation of persons of color.

58.    The percentage of blacks, women, and poor people on the venires for the grand jury and traverse jury was significantly less than the percentage that those groups comprise of the total population in Montgomery County. The selection of the venires violated Mr. Coral's rights under the Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

M.    MR. CORAL'S DEATH SENTENCE IS UNCONSTITUTIONAL BECAUSE IT WAS SOUGHT AND IMPOSED PURSUANT TO A PATTERN OF RACIAL BIAS.

59.    The victim in this case was white. The death penalty was sought and imposed against Mr. Coral in part because of her race and status in the community. The death penalty was sought and imposed against Mr. Coral because of the victim's race and status in the community. Had the victim in this case been poor or black, petitioner would likely not now be under a sentence of death. Although approximately 62% of all homicide victims in Alabama in the periods between 1983-1987 were of non-white victims, in 1990 approximately 82% of the persons sentenced to death in Alabama were convicted of killing

26

a white person. Only 4% of the reported Alabama homicides during this period involved white victims and black offenders. <u>1983-1987 Homicide and Rape Report</u>, Alabama Criminal Justice Information Center. In Montgomery County fewer than 25% of the victims of capital murders in cases where the death penalty was sought were persons of color. The death penalty is sought in the State of Alabama in an arbitrary and capricious fashion and pursuant to a racially discriminatory pattern in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments and the Alabama Constitution.

M.    PETITIONER'S RIGHTS TO A FAIR TRIAL BY AN IMPARTIAL JURY WERE VIOLATED BY THE TRIAL COURT'S FAILURE TO PERMIT INDIVIDUALLY SEQUESTERED VOIR DIRE OF PROSPECTIVE JURORS.

60.    The trial court denied Mr. Coral's pretrial motion for individual voir dire of the prospective jurors except as to *Witherspoon* questions. (R. 465.) In light of the pretrial publicity, the procedure mandated by the trial court for conducting voir dire denied Appellant the ability to conduct meaningful voir dire. Because voir dire was in groups, Mr. Coral's defense attorneys were forced to choose between possibly infecting the entire panel with a prejudicial answer to questions regarding veniremembers' knowledge of the case and, on the other hand, remaining ignorant of the veniremembers' knowledge and prejudice regarding the case. Defense counsel were hampered in their ability to uncover any particular veniremember's prejudice due to pretrial publicity. The trial court's denial of individually sequestered voir dire violated the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

27

O.    MR. CORAL WAS DENIED EFFECTIVE ASSISTANCE OF
COUNSEL DURING BOTH THE GUILT AND PENALTY
PHASES OF HIS TRIAL.

61.    The United States Supreme Court has repeatedly affirmed a defendant's

fundamental and constitutional right to the effective assistance of counsel at trial. *Williams*

*v. Taylor*, 529 U.S. 362 (2000); *Strickland v. Washington*, 466 U.S. 668 (1984). Since a fair

trial depends largely upon counsel's performance, the Court has recognized that inherent in

"'the right to counsel is the right to the *effective* assistance of counsel.'" *Strickland*, at 686

(quoting *McMann v. Richardson*, 397 U.S. 759, 771, n.14 (1970)) (emphasis added). In this

case, as a result of the deficient performance of his trial attorneys, Mr. Coral was convicted

and sentenced to death. His rights to counsel, to due process, to a fair trial and to a reliable

sentencing under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States

Constitution were violated.

1.    The Capital Compensation Scheme in Effect at
the Time of Mr. Coral's Trial Compromised the
Performance of His Attorneys.

62.    Mr. Coral was denied effective assistance at trial by the insufficient funding

provided by the State of Alabama for the compensation of capital defense attorneys, defense

expert assistance and for other defense expenses. The rate paid to attorneys defending death

cases hinder counsel from providing effective assistance because of the extremely low

funding provided by the state of Alabama for the compensation of capital defense attorneys

and for their expenses. At the time of Mr. Coral's trial, under ALA. CODE § 15-12-21(d)

28

(1975), the State of Alabama paid capital counsel only $40 per hour for time spent in court and $20 per hour for time spent out of court for a total of up to fifty hours. ALA. CODE § 15-12-21 limited court-appointed attorneys trying capital cases to a maximum of $1000 for out-of-court trial preparation for each phase of the capital trial. *See Ex parte Grayson*, 479 So. 2d 76, 79-80 (Ala. 1985).

63.    The restrictions on compensation placed significant constraints on what Mr. Coral's counsel could do to investigate adequately and prepare his case for trial. Trial counsel in this case, for example, did not interview any of Mr. Coral's family members from Chicago, Illinois, Mr. Coral's hometown. One of the barriers to the lawyers being able to spend more time in Illinois speaking with Mr. Coral's family was the lack of funds to do so. Additionally, the low funding allotted to lawyers, such as Mr. Coral's, amounted to a taking of their property without just compensation, in violation of the Fifth Amendment to the United States Constitution.

64.    Trial counsel could not adequately defend Mr. Coral with the compensation that was afforded in this case. The payment scheme under which Mr. Coral's counsel was compelled to work created a disincentive for attorneys to adequately represent capital clients. It is well-established that "[t]here can be no equal justice where the kind of trial a man gets depends on the amount of money he has." *Griffin v. Illinois*, 351 U.S. 12, 19 (1956). The compensation scheme, at the time of Mr. Coral's trial, violated the separation of powers doctrine, constituted a taking without just compensation, deprived indigent capital defendants

29

of the effective assistance of counsel, and offended the Equal Protection Clause and the Fifth,

Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

> 2.    Trial counsel failed to adequately object to the court's jury override and to challenge the appropriateness and constitutionally of an override in this case.

65.    Trial counsel was ineffective to not object to the trial court's override of the

jury's life recommendation and imposition of a death sentence.   The trial court considered

several circumstances, including Mr. Coral's prior record and that Mr. Coral was convicted

of multiple offenses in this case (later vacated), that were improper considerations in

sentencing.  Had counsel properly objected to the errors of the sentencing authority in its

analysis of the mitigating and aggravating circumstances, the jury's recommendation would

have been followed, and Mr. Coral would not have been sentenced to death.

66.    Counsel failed to object to the constitutionality of the Alabama capital statute

which permits the sentencing authority to override a jury's life recommendation without

application of any standards whatsoever, and without a clear and reasoned basis for the

sentencer's decision to override the jury's life recommendation.  Trial counsel failed to

object adequately to the impropriety of the trial court's rejecting the jury life verdict in this

case, including its improper reliance on invalid aggravating circumstances.   Had counsel

properly objected to Alabama's capital sentencing system, marshaling constitutional

arguments as to why Alabama's standardless override is unacceptable, then the sentencing

authority would have likely followed the jury's life recommendation, and Mr. Coral would

not have been sentenced to death.

             3.      Trial counsel failed to talk to family members
                    about mitigation evidence.

67.    Trial counsel failed to investigate adequately mitigating evidence for Mr. Coral's sentencing hearings before the jury and the judge. Many mitigating circumstances existed that trial counsel failed to investigate and present. Mr. Coral had many challenges as a young person, but was also loved and respected by his family and friends. However, at his penalty phase and judge sentencing, none of his family members were called to talk about him and his life. Counsel did not interview any of his family members such as his mother, his sister, his cousins or his aunts and uncles, who could have provided information about Mr. Coral's life and background.

68.    "[A] legal decision to forgo a mitigation presentation cannot be reasonable if it is unsupported by sufficient investigation." *Jackson v. Herring*, 42 F.3d 1350, 1368 (11th Cir. 1995). *See Wiggins v. Smith*, 539 U.S. 937 (2003) (counsel's decision not to present mitigating facts was based on an inadequate investigation and thus could not be considered strategic).

69.    Trial counsel's failure to investigate and present evidence from Mr. Coral's family meant that his sentencer did not hear available evidence of Mr. Coral's good character. Evidence existed which would have supported a finding that Mr. Coral had a good character, was loved by his family and friends, and had a positive influence on those around him, both as a child an adult. Counsel's failure to investigate and present this evidence

31

constituted ineffective assistance of counsel. *See Blake v. Kemp*, 758 F.2d 523 (11th Cir. 1985) (counsel ineffective to not present character evidence that the defendant was a "man who was respectful toward other, who generally got along well with people and who gladly offered to help whenever anyone needed something."); *Collier v. Turpin*, 177 F.3d 1184 (11th Cir. 1999); *Harris v. Dugger*, 874 F.2d 756 (11th Cir. 1989) (counsel ineffective to not investigate and present evidence regarding defendant's military service, school performance, family, and employment history); *Baxter v. Thomas*, 45 F.3d 1501 (11th Cir. 1995) (counsel ineffective for failing to contact defendant's family members, neighbors or social worker); *Jackson v. Herring*, 42 F.3d 1350 (11th Cir. 1995) (counsel ineffective for failing to contact family members willing to provide mitigating evidence). But for counsel's deficient performance, Mr. Coral would not have been sentenced to death.

> 4.    Trial Counsel Failed to Adequately Challenge the Systematic Underrepresentation of African-Americans in Mr. Coral's Jury Pools.

70.    Mr. Coral's grand and petit jury pools were selected in a manner which did not comport with constitutional guarantees and did not reflect a fair cross section of the community. Trial counsel failed to challenge the disparity between the percentage of blacks, women, and poor people on the venires for the grand jury and traverse jury and the percentage that those groups comprise of the total population in Montgomery County. Mr. Coral was entitled under federal law to consideration by a grand and traverse jury chosen from a pool that represented a fair cross section of the community. *Taylor v. Louisiana*, 419

32

U.S. 552 (1975); *Thiel v. Southern Pacific Co.*, 328 U.S. 217 (1946). Had trial counsel adequately challenged the underrepresentation of African-Americans on his jury, the result of his trial would likely have been different.

> 5.   Trial Counsel Failed to Adequately Object to the Admission into Evidence of a Prejudicial Presentence Investigation Report Which Included Inadmissible Hearsay, a Recounting of the Effects of the Crime on the Victims' Family and Juvenile Arrests.

71.   Trial counsel failed to adequately object to the inaccurate, prejudicial and inadmissible evidence contained in the pre-sentence report. (R. 1926-32.) The report contained information about improper and invalid convictions that led the trial court to find that the mitigating circumstance of 'no significant prior criminal history' did not exist. The report, in its entirety, did not meet the requirements for reliability and neutrality guaranteed by the Supreme Court in *Gardner v. Florida*, 430 U.S. 349 (1977) and *Proffit v. Wainwright*, 685 F.2d 1500 (11th Cir. 1982), *modified on rehearing*, 706 F.2d 311 (11th Cir. 1983). Had counsel objected to the inclusion of unattributed remarks and unadjudicated conduct, Mr. Coral would have had likely been sentenced to life without parole.

> 6.   Trial Counsel Failed to Object Properly to the Imposition of the Death Penalty in this Case Pursuant to a Pattern Evincing Racial Bias.

72.   Trial counsel failed to argue that Mr. Coral's death sentence was imposed pursuant to a pattern of racial bias. Mr. Coral was sentenced to death for the killing of a white victim. This imposition of a death sentence was pursuant to a pattern of racial bias that

33

characterizes the administration of the death penalty in Montgomery County and in Alabama as a whole. The discretion of the district attorney in choosing which cases to prosecute as death cases – as well as the discretion of the sentencing judge in determining which defendants to sentence to death – were influenced by the victim's race.

73.     In evaluating the risk that racism may taint the death penalty process, the U.S. Supreme Court has stated that the "question 'is at what point that risk becomes constitutionally unacceptable.'" *Turner v. Murray*, 476 U.S. 28, 36 n.8 (1986) (quoting *Woodson v. North Carolina*, 428 U.S. 280, 308-09 (1976)). The case law has made clear that under the Eighth and Fourteenth Amendments the influence of racial bias cannot be tolerated in capital cases. *Id.*; *McCleskey v. Kemp*, 481 U.S. 279 (1987). Trial counsel should have argued that race bias influenced this case as evidenced by the underrepresentation of African-Americans in the juror pool. Moreover, trial counsel should have argued that had the victim in this case been poor or black, Mr. Coral would likely not have faced a capital murder prosecution. The death penalty is sought in Montgomery County and the state of Alabama in an arbitrary and capricious fashion and pursuant to a racially discriminatory pattern in violation of the Eighth and Fourteenth Amendments to the United States Constitution, the Alabama Constitution and state law. *McCleskey v. Kemp*, 481 U.S. 279 (1987). Counsel's deficient performance prejudiced Mr. Coral. Had counsel objected to the racially discriminatory use of the death penalty, Mr. Coral would not have been sentenced to death. *Strickland v. Washington*, 466 U.S. 668 (1984).

34

III.    PRAYER FOR RELIEF

74.    For all of the above stated reasons and other such reasons as may be made upon amendment of this petition and a full evidentiary hearing, Robert Coral respectfully asks this Honorable Court to grant him the following relief:

(a)    grant petitioner's accompanying motion to proceed in this matter *in forma pauperis*;

(b)    afford petitioner an opportunity to reply to any responsive pleading filed by respondent;

(c)    grant petitioner discovery under Rule 6 of the Rules Governing Habeas Corpus Cases and a sufficient period of time to conduct discovery, and further grant petitioner authority to obtain subpoenas to further document and prove the facts set forth in this petition;

(d) grant petitioner an evidentiary hearing at which additional proof may be offered supporting the allegations set forth in this petition;

(e)    permit petitioner after additional factual development an opportunity to brief and argue the issues presented in this petition;

(f) issue a writ of habeas corpus granting Mr. Coral relief from his unconstitutionally obtained conviction and sentence of death; and

(g) grant such further and other relief as may be appropriate.

Respectfully submitted,

LaJuana Davis (DAV088)
122 Commerce Street
Montgomery, AL 36104
Tel:    (334) 269-1803
Fax:    (334) 269-1806
E-mail: ldavis@eji.org

Counsel for Mr. Coral

## ATTORNEY'S VERIFICATION

I affirm under penalty of perjury that, upon information and belief, this Petition for

Writ of Habeas Corpus is true and correct.  Signed on November 18, 2005.

LaJuana Davis

36

# CERTIFICATE OF SERVICE

I certify that on November 18, 2005, I served a copy of the attached amended petition

by first-class mail on:

Anne Adams
Assistant Attorney General
Office of the Attorney General
11 South Union Street
Montgomery, AL 36130

LaJuana Davis

37